IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    No. 21-cr-1040 KG

ALONDRA SANCHEZ,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Defendant Alondra Sanchez's Motion to Suppress Evidence and Statements (Motion), filed August 13, 2021. (Doc. 20). The United States timely responded, and Defendant timely replied. (Docs. 27 and 33). The Court held an evidentiary hearing on September 16, 2021. At the hearing, Assistant United States Attorneys Mark Saltman and Luke Rizzo represented the United States. Border Patrol Agents David Weems and Ramon Torres, and Drug Enforcement Agency (DEA) Special Agent Joe Zepeda testified on behalf of the United States. Assistant Federal Public Defendant Lynne McMullen represented Ms. Sanchez, who was present. The United States, with leave of this Court, filed a Supplemental Memorandum in Opposition on September 27, 2021. (Doc. 38). And Defendant timely responded. (Doc. 40).

Ms. Sanchez is charged with possession with intent to distribute 50 grams and more of methamphetamine and possession with intent to distribute cocaine based on evidence obtained during a border patrol checkpoint stop. Ms. Sanchez asks this Court to suppress physical evidence and statements based on violations of both the Fourth and Fifth Amendments. Having considered the Motion, the substantial briefing, the evidence admitted at the hearing, the parties'

516c87432d886b3e

oral argument, and the relevant law, the Court grants in part Defendant's Motion to Suppress and

excludes Ms. Sanchez's self-incriminating statement.

I.    *Findings of Fact*

At about 2:45 pm on March 5, 2021, Alondra Sanchez rode aboard a Greyhound bus

which was stopped and referred to the secondary inspection area of the United States Border

Patrol (USBP) checkpoint on Highway 70 southwest of Alamogordo, New Mexico.  Transcript

of September 16, 2021, Motion Hearing (Doc. 37) at 9:22–10:5.[1]  At the checkpoint, USBP

Agent David Weems conducted an immigration inspection of the bus.  Tr. at 10:21–22.  Though

Agent Weems boarded the bus alone, at some point during the sweep Agent Ramon Torres

boarded and stood at the head of the aisle by the door.  Tr. at 14:1–20.

On board the bus, Agent Weems noticed Ms. Sanchez sitting in a window seat, directly

next to another passenger. Tr. at 12:12–19, 16:24.  This raised his suspicion given the ongoing

COVID pandemic and the relative emptiness of the bus—there were only seven to ten people on

board out of 60 to 80 seats.  Tr. at 11:23–12:6.  According to his experience and training,

smugglers often travel and sit together as a precautionary measure.  Tr. at 16–18; 103–104.  He

also noticed that Ms. Sanchez wore a baggy sweatshirt, which he took as consistent with hiding

something.  Tr. at 20:7.

Agent Weems asked if the two were travelling together, and they responded that they

were not. Tr. at 15:3–8.  Agent Weems viewed Ms. Sanchez's valid U.S. Passport Card and

questioned her briefly.  Tr. at 21:10–16.  Ms. Sanchez said she was travelling from Juarez,

Mexico to Clovis, New Mexico.  Tr. at 18:5–14.  She said she had no luggage with her. Tr. at

---

[1] The Court's citation to the hearing transcript refers to the court reporter's original, unedited
version. Any final transcript may contain some differences in page and line numbers.

18:18–21.  At that point, Agent Weems was suspicious that Ms. Sanchez may be carrying something illegal.  Tr. at 24:6–12.  Agent Weems was also concerned about a language barrier between them because Ms. Sanchez answered in Spanish.  Tr. at 24:6–12, 53:3–7.  Agent Weems gave a "follow-me" hand gesture, and maybe said "come with me," and Ms. Sanchez followed him off the bus without saying anything.  Tr. at 23:14–24:4.

Standing to the side of the bus, Agent Torres questioned Ms. Sanchez in Spanish, and she repeated the answers given on the bus.  Tr. at 26:3–10.  Agent Weems noticed her lip quivering, and based on his suspicion, told Agent Torres to tell Ms. Sanchez they were going to get a female officer to pat her down.  Tr. at 27:2–18.  At no point did either Agent suspect that Ms. Sanchez was carrying a weapon or was a threat to their safety.  Tr. at 84:12–13.  At no point did the Agents tell Ms. Sanchez she was free to go nor did they ask her permission to talk to her or to search her.  Tr. at 81:2–15.  Instead, Agent Torres told Ms. Sanchez they were going to escort her inside and a female officer would search her.  Tr. at 74:23–75:3.  Ms. Sanchez then admitted she was carrying something under her sweatshirt.  Tr. at 28:14–17.  Up to this point, about ten total minutes had passed since the bus entered the inspection area.  Tr. at 44:13, 48:11.

Based on that statement, the Agents escorted Ms. Sanchez inside the checkpoint building and conducted a search of her body.  Tr. at 28–30.  Ms. Sanchez revealed a girdle around her abdomen and Agent Weems removed a package from it.  Tr. at 30:2–19.  Agent Weems' dog alerted to the contents, which he then removed and which field tested positive as methamphetamine.  Tr. at 31:3–25. The Agents placed Ms. Sanchez under arrest and read her *Miranda* rights; she invoked her right to remain silent.  Tr. at 32:9–20.

Later, DEA Special Agents Joe Zepeda and Lorenzo Trevizo arrived and again advised Ms. Sanchez of her *Miranda* rights.  Tr. at 87–89.  She again invoked her right to remain silent.

Tr. at 89:8–10.  The DEA Agents took custody of Ms. Sanchez and the drug evidence, which

later lab tested as containing both methamphetamine and cocaine.  Tr. at 89:11–90:12.

II.    *Conclusions of Law*

When evaluating the evidence on a motion to suppress, the "district court must assess the

credibility of witnesses and determine the weight to give to the evidence presented" and "the

inferences the district court draws from that evidence and testimony are entirely within its

discretion." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (holding the court

must not view the evidence in the light most favorable to the government); *see also United States

v. Torres*, 987 F.3d 893, 899 (10th Cir. 2021) (explaining the court "evenhandedly" considers the

evidence).  The burden of proof is by a preponderance of the evidence, *United States v. Matlock*,

415 U.S. 164, 177 n. 14 (1974).  That burden is borne first by the movant to show a violation of a

constitutional right, then by the government to show its behavior reasonable or that consent was

validly given.  *Goebel*, 959 F.3d at 1265; *United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir.

2018); *United States v. Ringold*, 335 F.3d 1168, 1171 (10th Cir. 2003).

This case presents myriad constitutional questions.  While the Court addresses each of the

issues raised by the Ms. Sanchez, it concludes the involuntariness of her admission is

determinative.  Because the Court concludes Defendant's statement that she was carrying

something under her sweatshirt was tainted by the announced, and would-be-unlawful, pat down

of her body, it holds the admission was coerced.  The Court, therefore, suppresses the statement

for being obtained in violation of the Fifth Amendment.

A.    *The Agents' Detention of Ms. Sanchez Was Lawful*

Ms. Sanchez challenges her detention at multiple points.  She argues first that the

questioning aboard the bus exceeded the Agents' authority; and second, that the detention off the

bus was supported by neither consent to be seized nor reasonable suspicion. (Doc. 20) at 2–8. The Court concludes that Ms. Sanchez was at no time seized in violation of the Fourth Amendment.

A stop at a border checkpoint is a seizure under the Fourth Amendment, though it is a permitted one. *United States v. Rascon-Ortiz*, 994 F.2d 749, 752 (10th Cir. 1993) (citing *United States v. Martinez–Fuerte*, 428 U.S. 543, 556 (1976)). The Constitution operates on border patrol checkpoints by limiting the scope of the detention. *Id.* (citing *Martinez-Fuerte*, 428 U.S. at 566–67). A routine stop must be brief and unintrusive. *Id.* (citing *Martinez–Fuerte*, 428 U.S. at 556). Where suspicious circumstances arise, a border patrol agent may ask a few additional questions concerning the suspicion during a routine inspection. *Id.*

The rules for busses are no different. When a bus enters the checkpoint and is referred to the secondary inspection location, border patrol agents are permitted to board the bus, question its passengers regarding citizenship and immigration status, make a brief visual inspection of their surroundings, and question the passengers regarding suspicious circumstances. *United States v. Hernandez*, 7 F.3d 944, 946 (10th Cir. 1993).

The Court determines the initial questioning on the bus was lawful. The Fourth Amendment permitted the Agents to direct the bus into secondary inspection and authorized them to question passengers about their immigration status. Agent Weems then had the requisite individual suspicion to ask Ms. Sanchez a few follow-up questions about her travel plans and luggage without the interaction becoming an unlawful seizure.

When Ms. Sanchez was asked off the bus, the scope of the detention changed, and so did the limits imposed by the Fourth Amendment. Any detention beyond a routine inspection, including removing a passenger from a bus, must be based on consent, reasonable suspicion, or

probable cause. *United States v. Rodriguez-Lopez*, 222 F. Appx. 784, 787 (10th Cir. 2007);
*Rascon-Ortiz*, 994 F.2d at 753.

Here, the Agents briefly detained Ms. Sanchez because they developed a reasonable
suspicion of criminal activity.  To determine whether an investigatory stop is supported by
reasonable suspicion, the court "must look at the totality of the circumstances of each case to see
whether the detaining officer has a particularized and objective basis for suspecting legal
wrongdoing." *United States v. Karam*, 496 F.3d 1157, 1162 (10th Cir. 2007) (quoting *United
States v. Arvizu*, 534 U.S. 266, 273 (2002)).  While reasonable suspicion may not be based on a
"mere hunch," "the likelihood of criminal activity need not rise to the level required for probable
cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.*
(quoting *Arvizu*, 534 U.S. at 274).  Courts must "defer to the ability of a trained law enforcement
officer to distinguish between innocent and suspicious actions." *Id.*

Based on the totality of the circumstances, Agent Weems had a particularized and
objective basis for suspecting Ms. Sanchez.  The fact that she and a fellow passenger were sitting
directly next to each other on an empty bus in the middle of a pandemic and claimed not to know
each other is suspicious.  That fact, combined with her lack of luggage, sufficiently raise a
reasonable suspicion.  Ms. Sanchez correctly attacks the government's evidence on at least one
count—starting a trip in a known drug source city like Juarez is insufficient on its own to suggest
criminality. *Id.* at 1163.  And this Court also finds that wearing a sweatshirt on a bus is, in
isolation, insufficient to develop suspicion that someone is hiding something.  Nonetheless, the
Court considers the totality of the circumstances and finds the Agents had reasonable suspicion,
a relatively low bar.  The facts that Ms. Sanchez was sitting next to someone, claimed she did not
know him, was wearing baggy clothes, originated in Juarez, and had no luggage are each

6

insufficient alone, but in totality are articulable and particularized facts giving rise to a reasonable suspicion.

Though the issue does not control the conclusion, the Court concludes Ms. Sanchez did not validly consent to be seized off the bus. The distinction between a consensual interaction and a seizure in the context of a bus is whether "a reasonable person would feel free to decline the officers' requests [to answer questions off the bus] or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *see also United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc). To be valid, a suspect must give consent which is "unequivocal and specific and freely and intelligently given." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010).

The Court first considers the nature of the exchange between Agent Weems and Ms. Sanchez. Agent Weems reported he did not ask, but simply used a "follow me" hand gesture, and maybe said "come with me." Tr. at 23:14–24:4. Ms. Sanchez then followed silently. *Id.* The Court is not persuaded that this act amounts to "unequivocal" consent, "freely and intelligently given." *See, e.g.*, *United States v. Muse*, 428 F. Supp. 3d 1186, 1197 (D.N.M. 2019) (holding that on-bus suspect's "act of standing up and raising his arms could have just as easily communicated mere submission to lawful authority" as specific and unequivocal consent to pat down search) (internal quotations omitted).

Second, the Court considers whether a language barrier existed between Agent Weems and Ms. Sanchez, and whether it weighed against consent. Indeed, it did. Agent Weems, after all, testified that one reason he asked Ms. Sanchez off the bus was that she only answered in Spanish and he was concerned they may not be understanding each other. Tr. at 24:6–12, 53:3–7. A language barrier can be determinative in these situations. *See, e.g.*, *United States v. Garcia-*

*Guzman*, 432 F. Supp. 3d 1324 (D.N.M. 2020) (finding Defendant did not clearly and unequivocally consent to pat down search of his body where DEA agent did not ask coherent question in Spanish in seeking consent); *see also United States v. Cruz-Zamora*, 318 F. Supp. 3d 1264 (D. Kan. 2018) (finding that Defendant, who spoke very limited English, did not understand police officer, and thus could not knowingly consent to search of vehicle, although defendant had some basic understanding of some of officer's questions and commands and was able to answer some questions in basic, broken English).

Despite the lack of valid consent, Ms. Sanchez's off-bus seizure was lawful because the Agents had reasonable suspicion which justified a brief detention.

### B.  Ms. Sanchez's Statement Was Not Obtained in Violation of Miranda

Ms. Sanchez challenges her admission that she was carrying something on her stomach by arguing it was taken in violation of her Fifth Amendment *Miranda* rights.  The parties do not dispute that the Agents did not read Ms. Sanchez a *Miranda* warning during their questioning of her outside the bus.  The Court concludes, however, that because the stop is accurately construed as a *Terry* stop, rather than a custodial interrogation, *Miranda* was not triggered.

The Court notes a *Terry* stop can become a custodial interrogation which requires *Miranda* warnings.  The Tenth Circuit has recognized that "whether an individual is subject to a lawful investigative detention within the meaning of the Fourth Amendment does not necessarily answer the separate question of whether a suspect is in custody for purposes of *Miranda*." *United States v. Revels*, 510 F.3d 1269, 1274 (10th Cir. 2007).  A suspect is in custody for purposes of *Miranda* when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Id.* at 1273 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).  Furthermore, *Miranda*'s "in custody" requirement is measured objectively, the proper inquiry

8

being whether a "reasonable person in the suspect's position would have understood his situation

as the functional equivalent of formal arrest." *United States v. Hudson*, 210 F.3d 1184, 1190

(10th Cir. 2000) (internal quotations omitted).

When Ms. Sanchez was taken off the bus for questioning, she was not detained in a

manner akin to a formal arrest.  Several relevant factors inform the fact-specific analysis,

including: (1) whether the circumstances demonstrated a police-dominated atmosphere; (2)

whether the nature and length of the officers' questioning was accusatory or coercive; and (3)

whether the police make the suspect aware that she was free to refrain from answering questions,

or to otherwise end the interview.  *Revels*, 510 F.3d  at 1275.  Whether a police encounter is

police-dominated is guided by certain fact scenarios:

> Separation of the suspect from family or colleagues who could offer moral
> support; isolation in nonpublic questioning rooms; threatening presence of several
> officers; display of a weapon by an officer; physical contact with the subject; and
> an officer's use of language or tone of voice in a manner implying that compliance
> with the request might be compelled.

*United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

The facts of this case are analogous to *Hudson*, 210 F.3d 1184.  In that case, the Court

held that brief questioning at a border checkpoint outside of the suspects' car did not amount to a

custodial interrogation for *Miranda* purposes.  *Id*. at 1192.  The suspects were asked to exit their

car and they were not given back their bill of lading, but nonetheless questioning only lasted ten

minutes, the defendants were not handcuffed or placed in a holding cell, they were never told

they were under arrest, the questions were not distinctly accusatory, and the agents never spoke

in a harsh or threatening manner or made any show of force.  *Id*. at 1192–93.  Similarly, in this

case, the officers never laid hands on Ms. Sanchez, never isolated her in a non-public place, did

not speak to her in a harsh or threatening manner, did not brandish weapons or handcuff her, and in all only questioned her for a few minutes.

For these reasons, the Court concludes the interaction between the agents and Ms. Sanchez was a *Terry* stop and did not become a custodial interrogation requiring *Miranda* warnings.

### C.  *Ms. Sanchez's Self-Incriminating Statement Was Coerced*

Ms. Sanchez also challenges her admission that she was carrying something on her abdomen by arguing it was coerced in violation of her Fifth Amendment Due Process right. Though the issue lacks controlling caselaw on point, the Court ultimately agrees.  The Court determines that despite the lack of trickery or deceit by the Agents, the announced pat down search would have been unlawful, and because that announcement elicited the admission, the admission must be suppressed.

### 1.  *The* Terry *Pat Down Would Have Been Unlawful*

*Terry* authorizes police to conduct over-body pat down searches during a warrantless investigative stop, but such a "frisk" is only justified if the officer "harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018).  The question is whether a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 905 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  Unequivocally, a *Terry* pat down is not authorized for any purpose other than a weapons search.  "Nothing in *Terry* can be understood to allow a generalized cursory search for weapons or indeed, any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979).

10

Here, according to testimony of Agent Torres, the officers did not believe that Ms. Sanchez was dangerous, did not witness her reaching for anything, and did not suspect her of carrying weapons. Tr. at 84:12–13. Moreover, the Government, during its presentation of its evidence and in its briefing, concedes the pat down search would have been unlawful. *See* Tr. at 75:10–21 ("After talking to counsel, they informed me that that's not what we should do"); (Doc. 38) at 7 (calling the pat down a "mistake"). The Court therefore determines the announced *Terry* pat down would have been straightforwardly unauthorized and violative of the Fourth Amendment.

### 2. *The Pat Down Would Have Been an Unreasonable Mistake of Law*

The pat down cannot be excused as a reasonable mistake. The Supreme Court has held that police officers are permitted to make certain mistakes of law. Distinct from but related to the issue in this case, reasonable suspicion may be based on a mistaken understanding of the scope of a legal prohibition. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (holding officer's mistake of law, in stopping vehicle for which one of the brake lights was working, was reasonable). Significantly, and essential to the question here, the Fourth Amendment only permits an officer to make "objectively reasonable" mistakes. *Id.* at 66.

The Tenth Circuit has held that "an officer's mistake of law may be reasonable if the law is ambiguous (reasonable minds could differ on the interpretation) and it has *never been previously construed* by the relevant courts." *United States v. Cunningham*, 630 Fed. Appx. 873, 876–77 (10th Cir. 2015) (emphasis added). In *United States v. Romero*, for example, the Tenth Circuit reversed the District Court on precisely these grounds. 935 F.3d 1124 (10th Cir. 2019). Indeed, this Court denied a suppression motion by a defendant charged with unlawful possession of a firearm. *Id.* The defendant had been arrested for obstructing an officer in violation of New

Mexico law, and then searched incident to that arrest. *Id.* The Tenth Circuit held that the officer who arrested the defendant made an unreasonable mistake of law because courts had already construed the statute in ways that would have prohibited the officer's arrest and search of the man. *Id.*

In this case, the caselaw prohibiting the use of *Terry* pat downs for anything other than weapons is well-established. The Court accepts Border Patrol Agents as credible and sincere in their belief they could pat down Ms. Sanchez, but their mistake of law is unreasonable.

### 3. The Admission Was Coerced

The Court now addresses the difficult issue of what constitutes police coercion in a case that does not easily fit within existing precedent. The Fifth Amendment Due Process Clause protects a suspect against coerced confessions even where *Miranda* has not attached—and the parties dispute whether Ms. Sanchez's statement that she was carrying something on her abdomen was blurted out voluntarily or provoked via coercion. This protection against coerced confessions often arises in two different ways.

The first, more common, invocation of the Fifth Amendment is in cases involving police deceit and deprivation leading to confessions made under duress. These cases often involve rather extreme police misconduct—behavior which is not alleged in this case. The second way involves cases where a Fourth Amendment violation (*i.e.*, an illegal search or seizure) precedes, and taints, a subsequent confession. This form of coercion, much less shocking and much more subtle, is implicated by the facts of this case. The Court examines both in concluding that Ms. Sanchez's confession is too closely intertwined with the announced, illegal body search to have been made of her own free will.

"To be admissible, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir.1993) (citing *Haynes v. Washington*, 373 U.S. 503, 513 (1963)). The due process test for evaluating the voluntariness of a defendant's confession requires inquiry into whether defendant's "will has been overborne and his capacity for self-determination critically impaired." *United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020). Confessions obtained involuntarily must be excluded. *Dickerson v. United States*, 530 U.S. 428, 434 (2000). Importantly, the government bears the burden of showing voluntariness by a preponderance of the evidence. *Young*, 964 F.3d at 942.

Under a standard analysis, physical and psychological coercion are dispositive of voluntariness. The inquiry requires consideration of "both the characteristics of the accused and the details of the interrogation." *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002). This test "does not favor any one of these factors over the others—it is a case-specific inquiry where the importance of any given factor can vary in each situation." *Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015).

Generally, confessions are often deemed involuntary in rather extreme circumstances involving factors like extended interrogation; use of trickery, deception, threats, or promises of leniency; deprivation of access to family or nourishment; the suspect not being made aware of their rights; and the age, education, mental stability, state of sobriety, and familiarity with the criminal justice process of the defendant. *See, e.g.*, *Young*, 964 F.3d at 942 (holding that telling suspect he faced longer sentence than was true and that officer could "buy down the amount of time" in prison if suspect cooperated was a promise of false leniency dispositive of voluntariness); *Gallegos v. Colorado*, 370 U.S. 49 (1962) (holding confession state officers

obtained from 14-year-old boy, who had been held five days without officers sending for his parents or seeing that he had advice of lawyer or adult friend, and without their bringing him immediately before judge, was obtained in violation of due process); *Haynes v. State of Washington*, 373 U.S. 503 (1963) (holding that defendant's written confession was involuntary and inadmissible where it was made while defendant was held by police incommunicado and after he was told by police officers that he could not communicate by telephone with his wife until after he made written confession); *Spano v. New York*, 360 U.S. 315, 323 (1959) (holding that questioning for hours without a break and using a patrolman who was the suspect's childhood friend to convince the suspect to confess so that patrolman would not be in trouble from his superiors was coercive); *c.f. United States v. Rodriguez*, 836 F. Supp. 2d 1258 (D.N.M. 2011), *aff'd on other grounds*, 739 F.3d 481 (10th Cir. 2013) (holding statement voluntary after six-and-a-half minute interrogation where officers removed defendant's handgun from his pants but did not use physical force, asked questions aggressively and accurately stated possible consequences, but did not threaten, promise, or induce defendant into confessing).

Indeed, the Government offers examples of such cases to argue the instant case falls well short of coercion. *See* (Doc. 38) at 5. Limited to analogizing to those more extreme examples, the Agents' behavior in this case would be deemed non-coercive and the confession given free of any Fifth Amendment violation. The Agents here did not use violence, hold Ms. Sanchez for an extended period, question her intensely, deprive her of food or outside communication, or intentionally trick her; Ms. Sanchez was not a minor nor mentally handicapped nor under the influence.

Coercion exists on a continuum however, varying by degree, and courts have found coercion in lesser situations where a Fourth Amendment violation precedes a confession.

Specifically, confessions have been found inadmissible when induced by the exploitation of some illegal action, such as an illegal arrest or an unlawful search and seizure. *See e.g.*, *Fahy v. State of Connecticut.*, 375 U.S. 85, 91 (1963) (holding defendant should have had chance to show that his confession should be excluded because it was induced by being confronted with illegally seized evidence); *Wong Sun v. United States*, 371 U.S. 471 (1963) (holding that where officers had broken door and followed defendant into bedroom, defendant's self-incriminating response to questioning was not sufficiently act of defendant's free will in consideration of unlawful invasion).

In a series of cases—*Wong Sun v. United States*, 371 U.S. 471 (1963); *Brown v. Illinois*, 422 U.S. 590 (1975); *New York v. Harris*, 495 U.S. 14 (1990)—the Supreme Court has addressed when a Fourth Amendment violation requires exclusion of downstream confessions. These cases are somewhat different from Ms. Sanchez's: they each involve an actual Fourth Amendment violation and not merely a threatened violation. Nonetheless, the cases all contain the element of a confession illegally obtained and they stand for the proposition that an illegal search or seizure can be dispositive of a confession's voluntariness.

The key issue in those cases is the proximity of the Fourth Amendment violation to the subsequent confession. In *Wong Sun*, the Court explained that the test of excludability is whether evidence was obtained by "exploitation of illegality" as opposed to "by means sufficiently distinguishable to be purged of primary taint." 371 U.S. at 487. The cases provide helpful guidance. In *Wong Sun* and *Brown*, the Court excluded confessions because they were causally related to Fourth Amendment violations while in *Harris*, it did not.

In *Wong Sun*, the police illegally entered a home without a warrant and confronted a man with evidence from a confidential informant that the man had been selling the informant drugs.

15

371 U.S. at 486–487.  The man responded to the questioning in ways that incriminated him and

others, and the Court reasoned the admission should be excluded because it was too closely

proximate to the illegal entry to be an answer made of his own free will.  *Id*.  The Court did not

deeply consider the Fifth Amendment issue but explained that its decision was meant to deter

"lawless conduct by federal officers" under the Fourth Amendment.  *Id*. at 486.  The Court also

reasoned that where the exclusionary rule is implicated, there should be no "distinction between

physical or verbal evidence" obtained in violation of the Fourth Amendment, and that there

should be no "relaxing" of the rule for verbal evidence.  *Id*.  That is, verbal evidence which

derives immediately from officer misconduct is no less the fruit of the poisonous tree than more

common, tangible fruits.  *Id*. at 485.  To the extent that the voluntariness of the defendant's

statement was considered, it was only to assess whether it "was sufficiently an act of free will to

purge the primary taint of the unlawful invasion."  *Id*. at 486.

 In *Brown*, the Court again reversed the inclusion of a confession.  There, a defendant was

arrested without probable cause or a warrant, in violation of the Fourth Amendment.  422 U.S. at

591.  While in custody, he was read his *Miranda* rights and then made two inculpatory

statements.  *Id*.  The Court held that the *Miranda* warning was insufficient to break the causal

link between the illegal arrest and the confession and thus the confession could not be deemed

voluntary.  *Id*. at 605.

 In that case, the Court more fully considered the relationship between the Fourth and

Fifth Amendments.  The Court explained that the exclusionary rule applies to both

Amendments—though under the Fourth it is a broader exclusion, meant to stop all illegal

searches and seizures regardless of whether the acts uncover incriminating evidence.  *Id*. at 601.

Thus, the exclusion of a confession is appropriate to vindicate the Fourth Amendment and may

in fact "not alone sufficiently deter a Fourth Amendment violation." *Id.* The Court reasoned a

valid *Miranda* warning could not cure the taint of an illegal arrest because, if so, police would be

incentivized to arrest suspects illegally but repair the violation with a simple *Miranda* warning.

*Id.* at 602. The Court reasoned that any "incentive to avoid Fourth Amendment violations would

be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee

against unlawful searches and seizures could be said to be reduced to 'a form of words.'" *Id.*

The Supreme Court's reasoning in *Wong Sun* and *Brown* establishes that the suppression of a

confession is appropriate for sanctioning Fourth Amendment violations, even where the Fifth

Amendment voluntariness analysis may not by itself demand exclusion, because the Fifth

Amendment should not be used to excuse a Fourth Amendment violation.

      The Court further explained the three factors in conducting a voluntariness inquiry in the

context of an illegal arrest. "The temporal proximity of the arrest and the confession, the

presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official

misconduct are all relevant." *Id.* at 603–04 (internal citations omitted). In *United States v. Caro*,

the Tenth Circuit applied the *Brown* factors to analyze consent after a Fourth Amendment

violation and explained that the court uses a totality of the circumstances standard to ascertain

sufficient "attenuation" between the two. 248 F.3d 1240, 1247 (10th Cir. 2001).

      In *Harris*, the Court found a confession too attenuated from the Fourth Amendment

violation to mandate exclusion. In that case, police had probable cause but lacked a warrant or

consent when they entered a suspect's home and arrested him in violation of the Fourth

Amendment. 495 U.S. at 15–16. Once taken to the station house, he wrote a confession. *Id.*

The Court declined to exclude it. The Court reasoned that while the arrest began a process that

culminated in the acquisition of the confession, the confession itself "was not the fruit of the fact

17

that the arrest was made in the house rather than someplace else." *Id.* at 20.  That is, there was

not a direct causal relationship between the interest protected by the Fourth Amendment

(entering the home without consent) and the subsequent confession.

This Court applies the principles of those cases here.  The first is that the Fourth and Fifth

Amendments can easily "coalesce," *Brown*, 422 U.S. at 601.  And when they do, the government

must prove both that the confession meets "the Fifth Amendment standard of voluntariness" *and*

that it is "sufficiently an act of free will to purge the primary taint" from the precedent Fourth

Amendment violation.  *Id.* at 602 (quoting *Wong Sun*, 371 U.S. at 486); *see also United States v.*

*Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) ("[T]he government must also establish a

break in the causal connection between the illegality and the evidence thereby obtained").

The second principle, related to the first, is that where the government conducts an

unlawful search, the fact that evidence discovered is verbal rather than physical does not change

the Court's imperative to sanction Fourth Amendment violations.  *See Wong Sun*, 371 U.S. at

486.  The exclusionary rule is a sanction meant to protect both Fourth and Fifth Amendment

rights, and police misconduct should not be excused by a Fifth Amendment voluntariness

analysis where there is an antecedent Fourth Amendment wrong.  *See Wong Sun*, 371 U.S at 486;

*see also Melendez-Garcia*, 28 F.3d at 1054 ("The mere fact that consent to search is voluntary …

does not mean that it is untainted by a prior illegal arrest."); *see also Elkins v. United States*, 364

U.S. 206, 217 (1960) ( "The [exclusionary] rule is calculated to prevent, not to repair").

The case before the Court has a significant distinction with this precedent, however.

Here, the Agents did not, in the end, violate the Fourth Amendment.  So, the question this Court

confronts now is whether the announcement of an unlawful search, which is not in fact

completed, render an elicited confession involuntary and inadmissible?  The Court holds that it can, and that in this case, it did.

First, Ms. Sanchez's confession was not sufficiently an act of free will to purge it of the taint of the threatened, unlawful search.  The confession fails two of the three *Brown* factors—temporal proximity and lack of intervening causes.  The evidence shows there is a strong and direct connection between the announced pat down search and Ms. Sanchez's admission that she was hiding something.  The confession came immediately after she was informed of the imminent body search.  That close temporal relationship is akin to the facts in *Wong Sun*, where an illegal entry by police was followed immediately by the suspect's incriminating statements; it is a much stronger relationship than that in *Brown*, in which time and a *Miranda* warning separated the illegal police conduct from the confession.  Additionally, there is a but-for causal relationship in this case lacking any intervening causes or attenuation.  The Court finds no reason for Ms. Sanchez to blurt out that she was hiding something except that she objectively believed the search was certain and the discovery was unavoidable.  On the third *Brown* factor, the flagrancy and intent of the Agents' conduct, the Court finds no flagrancy here or misconduct.  In a factually similar case, the Tenth Circuit held a consent to be searched involuntary on the first two *Brown* factors without finding officer purposefulness.  *Caro*, 248 F.3d at 1247.  Similarly, the Court determines the totality of the circumstances favors the conclusion that Ms. Sanchez's confession was involuntary.  Her statement was the result of the announcement of the unlawful search and was not purged of its taint.

Ms. Sanchez relies on *Bumper v. North Carolina* for the proposition that a Fourth Amendment violation can be a form of coercion.  391 U.S. 543 (1968).  It is true that *Bumper* is imperfectly analogous to our case because it is an inquiry into the validity of the consent to be

searched rather than the voluntariness of a confession.  But the factual similarities are apparent,
and the specific issue of whether a Fourth Amendment violation can affect voluntariness is
relevant.  In *Bumper*, police lied that they had a search warrant which convinced a homeowner to
let them into her house, where police then found incriminating evidence which they claimed was
obtained with consent.  *Bumper*, 391 U.S. at 546.  The Court held that "[w]here there is coercion
there cannot be consent."  *Id* at 550.[2]

Relevant to the present case, the Court in *Bumper* de-emphasized the subjective intent of
the officers and focused on the objective perception of the suspect to determine the voluntariness
of her consent.  The Court there explained that officer trickery was not necessary to its
conclusion; rather the fact of announcing a warrant would be coercive whether the police were
intentionally deceptive, or the warrant had merely been invalid.  *Id*. at 549–550.  This is because
"[w]hen a law enforcement officer claims authority to search a home under a warrant, he
announces in effect that the occupant has no right to resist the search."  *Id.* at 550.  That
reasoning—that a search warrant, whether lied about or not, leaves a suspect feeling they are
unable to refuse police entry and thus unable to validly consent—is applicable here.  Viewed
from the standpoint of the suspect, the announcement of the unlawful search, whether or not
intentionally deceitful, led Ms. Sanchez to reasonably believe that discovery was inevitable.
Under these conditions, a confession cannot be deemed to have been made with free will.  This

---

[2] The Government cites to *United States v. Jones*, another consent-to-be-searched case, in which
the Tenth Circuit upheld the consent as voluntary, to support the argument that the agents in this
case could not have overborn the will of Ms. Sanchez.  701 F.3d. 1300 (10th Cir. 2012).  In
*Jones*, however, the police neither effectuated nor threatened a Fourth Amendment violation.  It
is the presence of Fourth Amendment issues which makes the instant case different from other
Fifth Amendment analyses.  Because the court did not bring its attention to bear on the
interaction between the Fourth and Fifth Amendments in *Jones*, this Court finds the case less
relevant than *Bumper*, despite the cases' other similarities.

Court similarly concludes that Ms. Sanchez's admission, despite a lack of intentional trickery or misconduct, was neither voluntary on its own nor purged of the taint of the announced unlawful search.

Second, the fact that no Fourth Amendment violation in fact occurred here is an important distinction from the precedent. However, that fact has limited significance for the following reasons. Here, the Fourth and Fifth Amendments "coalesced," because of the announced, unlawful search. The unlawful search was aborted only because its announcement provoked a confession, rendering the search unnecessary. That search, as discussed above, would have been unlawful had it been conducted, and tangible evidence obtained from it would have been excluded. Although the agents did not intend to deceive, their intention to conduct a search was based on an unreasonable mistake of law. Moreover, regardless of the presence of trickery, from the perspective of Ms. Sanchez, the discovery of the evidence was inevitable—and that reasonable perception elicited her confession in anticipation of the body search. Guided by *Wong Sun* and *Brown*, and for the reasons described above, and even though no Fourth Amendment violation was in fact effectuated, the Court concludes Ms. Sanchez's confession must be suppressed as a violation of her Fifth Amendment right.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress (Doc. 20) is GRANTED in part. It is further ORDERED that Ms. Sanchez's self-incriminating statement is suppressed.

UNITED STATES DISTRICT JUDGE